IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 CR 728 |
| v. | ) | |
| | ) | Honorable Virginia M. Kendall |
| THOMAS VIVIRITO, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT, AND SENTENCING MEMORANDUM**

Defendant, **THOMAS VIVIRITO**, by and through his attorneys, **BLEGEN &
GARVEY**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18
U.S.C. § 3553(a), as well as the Sixth Amendment to the Constitution of the United
States and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220.,
125 S. Ct. 738 (2005), respectfully submits the following Objections to the
Presentence Investigation Report, and Sentencing Memorandum.

I.    **Introduction**

From the outset, Mr. Vivirito (hereinafter "Tom") and his family have
indicated to counsel that they want to make clear their sincere remorse for the
damage done to the victims of Tom's offenses and to assure the Court that they
(Tom and his family) will make every effort, as they have done for the past nearly
three years, to ensure that the conduct is never repeated. Tom and his family
realize that there will be long-lasting negative ramifications for the victims, and

1

while they understand little can be done to make everything right, it is for this reason that Tom has agreed to pay restitution to victims even who are outside of the offense of conviction. *See*, Plea Agreement, par. 16 (Docket 125). It is also for this reason that the defense has agreed to extend the time for the government to gather information related to restitution. (Docket 133)

Because of this same desire to assist victims in every way he could, Tom sat for a proffer meeting with the government nearly two years ago and provided his accounts, passwords, and consented to access to his devices and accounts.[1] As the Court well knows, information derived from proffers (leads) are not protected, but Tom sat for that proffer and provided his social media accounts and passwords so that any victims could be found. Due to his rampant drug use, Tom's recollection of people and events from that time in his life is often hazy. But his desire, as he made clear to counsel, was to provide the government with everything he did and everything he knew, so that individuals who were victimized and needed help could be identified.

Tom's offenses, of course, cannot be erased by his best intentions now, nor can his personal history excuse his treatment of the victims. Tom's personal history is nevertheless important because it explains how Tom came to commit his offenses, and provides the Court a compelling basis to conclude, in light of Tom's

---

[1] As noted herein, the PSR should be corrected to indicate that Tom did indeed sit for a proffer with the government on August 12, 2020, and provided passwords and consent to access his accounts.

extraordinary efforts to address his personal issues, that his offenses will not be repeated.

In short, and as discussed in more detail herein, Tom has suffered the entirety of his life from serious physical medical conditions (most significantly severe atopic dermatitis) as well as a variety of mental health issues (most significantly depression and drug addiction starting in his teenage years) that are all interrelated. Tom has struggled all of his life with atopic dermatitis, leading him to despise his own appearance, to isolate himself from others, and eventually to depression and drug addiction with a history of life-threatening overdoses.

The history and severity of Tom's afflictions, as well as the connection between those issues and Tom's offenses, is well documented in medical records and doctor's reports that have been combined in an under seal exhibit, with documents broken down by bookmarks, filed along with this memorandum. While he has been released on bond, Tom has also undergone a psychosexual evaluation, has been examined by a clinical neuropsychologist, has received extensive treatment for his drug addiction, and has undertaken sex offender counseling. Supporting documents related to those issues are also part of the same under seal exhibit.

While the under seal exhibit provides a cover page listing the attached materials and associated bookmarks, that list is provided here as well for the Court's convenience:

Bookmark 1:      Karen Smith psychosexual evaluation 4/15/19

Bookmark 2:      Karen Smith progress letter 10/29/19

Bookmark 3:      Karen Smith progress letter 2/18/20

Bookmark 4:          Karen Smith progress letter 2/18/21

Bookmark 5:          Summary of medical and mental health history (and
                     photographs) prepared by Marianne Vivirito

Bookmark 6:          Medical records from Dr. Edward Keuer

Bookmark 7:          Medical records and updated letters from Dr. Diane Ozog

Bookmark 8:          Quest Diagnostic records reflecting immunoglobulin levels in
                     2015

Bookmark 9:          Neuropsychological evaluation from 2015

Bookmark 10:         Medical records from National Jewish Health from 2016

Bookmark 11:         Medical care plan 2018

Bookmark 12:         Dr. Coleen Keegan letters (dated 2/10/21, 5/11/21, and 2/1/22)

Bookmark 13:         Dr. Susan Rohde letters (11/18/20, 2/7/22)

Bookmark 14:         Dr. Michael Gelbort report (1/23/20)

Bookmark 15:         Hazelden report (9/23/19)

Bookmark 16:         Midwest Center for Hope and Healing letter (2/1/21)

Bookmark 17:         Dr. Charles Burda letter (2/8/21)

Bookmark 18:         Weekly Diary of Thomas Vivirito

## II.    Objections to the Presentence Investigation Report

While the defense has some objections / clarifications to the PSR and disagrees with some of the Guideline calculations and factual conclusions, the defense appreciates the level of detail and analysis provided by the Probation Officer.

### 1.   <u>Adjustment for Acceptance of Responsibility; Page 8, ¶37</u>

The PSR reflects that Agent Hulliberger stated that Tom did not participate in an interview with federal law enforcement officers. Counsel requests that the

PSR be corrected to indicate that Tom did, in fact, engage in a proffer session with federal agents. He also authorized the agents to take over his social media accounts for any investigative purposes they saw fit and provided passwords to access his devices.

2. <u>Specific Offense Characteristics; Pages 9, 10 & 11, ¶¶ 46, 54, & 64</u>

According to the PSR, and contrary to the guidelines calculations set forth in the plea agreement, each separate group is increased by two levels because the PSR concluded that the offense "involved sexual contact." The "sexual contact" relied upon by the Probation Department is the victim touching herself. Counsel submits that this enhancement is inapplicable in this circumstance for the following reasons.

Pursuant to §2G2.1(b)(2)(A), if the offense involved "a sexual act or sexual contact, increase by 2 levels." The Application Notes further define "sexual contact" as "the meaning given that term in 18 U.S.C. §2246(3)." Pursuant to 18 U.S.C. §2246(3), sexual contact means:

> the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

A plain reading of this language suggests that contact by another person is necessary for the enhancement to be applicable. And, the Seventh Circuit has not ruled directly on this question. [2] Counsel's research has uncovered cases from other

---

[2] In reviewing an *Anders* brief, the Seventh Circuit noted that the sexual contact enhancement was not applied, but arguably should have been where the defendant

5

circuits concluding that "sexual contact" includes masturbation. *See*, *United States v. Raiburn*, 20 F.4th 416 (8th Cir. 2021); *United States v. Dean*, 591 Fed.Appx. 11 (2nd Cir. 2014); *United States v. Pawlowski*, 682 F.3d 205 (3rd Cir. 2012); *United States v. Aldrich*, 566 F.3d 976 (11th Cir. 2009); *United States v. Shafer*, 573 F.3d 267 (6th Cir. 2009).

Counsel submits those cases have been wrongly decided. As the *Raiburn* Court itself noted, the House Judiciary Committee's report "indicates that 'the Sexual Abuse Act of 1986 [ ], of which §2246(3) is a part, was drafted with the intention of 'reach[ing] all forms of sexual abuse **of another**.''" *Raiburn*, 20 F.4th at 424, *quoting Shafer*, 573 f.3d at 273 (quoting H.R.Rep. No 99-594, at 11 (1986) (Emphasis added). That the legislative intent was to punish sexual abuse of another indicates that the contact must be between more than one person.

Counsel further submit that reading the statutory language of §2246(3) in such a way that it includes self-touching would necessarily result in enhanced sentences without illegal conduct. For instance, an image of an individual touching their own clothed inner thigh – an image that plainly does not depict illegal conduct – could serve to enhance a defendant's sentence. Reading out the requirement of the participation of more than one person would result in an untenable application of the enhancement.

---

demanded that the victims touch themselves, and in one instance had one victim sexually abuse a friend for the defendant's gratification. Because of the court's conclusion, there was no plain error in the calculation of the guidelines. *See*, *United States v. Shea*, 493 Fed.Appx. 792, 795-96 (7th Cir. 2012).

### 3. **Specific Offense Characteristics; Page 10, ¶¶55-56**

As set forth in the plea agreement, the defense reserved the right to challenge the legal applicability of a four-level enhancement for the offense involving material portraying sadistic or masochistic conduct, or other depictions of violence, pursuant to U.S.S.G. §2G2.1(b)(4)(A). The PSR has applied the enhancement concluding that "insertion of a hairbrush handle into the anus and/or vagina of a 12-year-old female is a depiction of sadistic or masochistic conduct." PSR, ¶55. Counsel submits that the enhancement does not apply.

Stipulated Offense One includes a video of Minor A penetrating her vagina and anus with the handle of a hairbrush. Plea Agreement, p. 5. As the PSR notes, the handle was oval or cylindrical. (PSR, ¶20) It should first be noted that it does not appear from counsel's review of the evidence that Tom requested Minor A penetrate herself vaginally or anally with the handle of a hairbrush. More importantly, however, counsel submits that there is nothing **objectively** sadistic or masochistic about vaginal or anal penetration with the handle of a hairbrush.[3]

In *United States v. Johnson*, 784 F.3d 1070 (7th Cir. 2015), the Seventh Circuit concluded that the proper question when determining whether an image qualifies under §2G1.2 (b)(4)(A) as sadistic or masochistic is "whether the image itself would be objectively considered sadistic." *Id.*, at 1074. In *Johnson*, the

---

[3] To the extent that the PSR relies on the subjective opinion of Agent Hulliberger that the minor is grimacing during the vaginal insertion of the handle (PSR, ¶¶20, 55), counsel would note that the test is *objective* rather than *subjective* standard. *See*, *United States v. Johnson*, 784 F.3d 1070, 1074 (7th Cir. 2015).

defendant had been given the four-level enhancement for an image depicting a twelve-year-old girl inserting the handle of a screwdriver into her vagina.[4] The district court applied the enhancement because the victim was only twelve and stated that she felt embarrassed engaging in the conduct. *Id.*, at 1073. Also, according to the district court, the enhancement was applicable because "there's only one purpose of the vagina… And that's for the insertion of a penis." *Id.* While ultimately upholding the application of the enhancement, the Seventh Circuit rejected the district court's analysis.[5]

As the Seventh Circuit concluded, given that the victim was barely twelve and "the potentially violent connotations readily associated with a workshop tool such as a screwdriver," the district court did not err in applying the enhancement. *Id.*, at 1075. The Court went on to note, however, that:

> [w]e would not go as far as the Eighth Circuit in suggesting self-penetration by a minor of a foreign object would *always* be violent or sadistic. As Johnson points out, certainly there are circumstances where self-penetration by a foreign object would be within the realm of sexual exploration or self-pleasuring – it is certainly not our place to opine on the varied and creative sexual proclivities of even minor individuals.

*Id.*

Applying the reasoning of the *Johnson* Court to this case, the video at issue here does not objectively portray sadistic or masochistic conduct. A hairbrush is a

---

[4] There were also images of the minor inserting a highlighter into her vagina, but that image was not relied on to form the basis of the enhancement. *Id.*, at 1072.

[5] The court also notably rebuked the district court for the suggestion that the vagina serves the sole purpose of insertion of a penis, by noting the significant purpose of childbirth. *Id.*, at 1075.

common household item a minor individual would likely keep in their bedroom. The handle was cylindrically shaped and of standard size. Furthermore, a hairbrush has no potentially violent connotations, unlike a workshop tool such as a screwdriver.

Moreover, it cannot be concluded that because Minor A inserted the handle of the hairbrush into her anus that this fact alone transformed the conduct into sadistic conduct. "Sexual exploration and self-pleasuring", even amongst minor individuals, as the entire LGBTQ+ community can attest, does not stop at the vagina.

Simply put, under the circumstances here, there was nothing objectively violent about the video. The four-level enhancement pursuant to §2G2.1(b)(4)(A) does not apply.

4. <u>Total Offense Level; Page 12, ¶77</u>

The PSR has calculated a Total Offense Level of 42. Based on the Guidelines objections set forth herein, it is the defense position that the Total Offense Level is instead 36.

5. <u>Personal and Family Data; Page 14, ¶90</u>

Both Tom's mother and father are 65 years old.

6. <u>Physical Condition; Page 16, ¶¶ 104, 107-108</u>

The PSR correctly lists Tom's allergies. Counsel would request that it be noted that he is severely allergic to the listed items and could go into anaphylaxis if exposed to those allergens. It should further be noted that his atopic dermatitis and asthma are also very severe. Furthermore, Tom is no longer prescribed

Hydrocodone or Cyclobenzaprine. He also currently under the care of Dr. Juliana Basko in Naperville, Illinois (dermatology).

    7. <u>**Mental and Emotional Health; Page 18, ¶126**</u>

Tom's medications have changed slightly since the PSR interview. He is no longer prescribed Adderall or Lexapro. His dose of Klonopin is now 2 mg, and Gabapentin is 1200 mg. He is also now prescribed Prozac (40 mg), Vivance (70 mg) and Naltrexone (50 mg).

    8. <u>**Educational, Vocational and Special Skills, Page 21, ¶153**</u>

Tom participated in volunteer work through Stritch School of Medicine at the organizations listed in this paragraph. He also volunteered separately through the charity organized by his grandmother.

    9. <u>**Sentencing Options: Custody; Page 24, ¶167**</u>

Based on counsel's objections to the PSR set forth herein, the defense submits that the Total Offense Level is 36, rendering a guideline sentencing range of 188-235 months.

## III.    Considerations under 18 U.S.C. § 3553(a)

The Court is no doubt familiar with the wide sentencing discretion provided under 18 U.S.C. §3553(a) since the Supreme Court decided *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), and reiterated that discretion in cases such as *United States v. Rita*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S 38 (2007). The statutory sentencing factors found in §3553(a) provide the Court with a framework upon which to "impose a sentence sufficient, but not greater than

necessary, to comply with the purposes" of sentencing, by taking into account, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to satisfy the purposes of sentencing, and the need to avoid unwarranted sentencing disparities. This Court should also consider policy statements of the Sentencing Commission and any empirical evidence used to establish the Guidelines.

Moreover, the sentencing guidelines are only one factor to be considered by the Court in fashioning the appropriate sentence. *United States v. Carter*, 530 F.3d 565 (7th Cir. 2008). Courts are free to disagree with the guidelines, and vary from the advisory range based on the facts of the individual case, so long as they act reasonably. *United States v. Page*, 601 F.3d 743 (7th Cir. 2010).

It is counsel's position that the Guideline range in this case is 188-235 months. The statutory mandatory minimum is 60 months, and the statutory maximum is 240 months. While the Senior U.S. Probation Officer has calculated the Guidelines as the statutory maximum, the Officer's recommendation makes clear that there are specific circumstances in this case that call for a below Guidelines sentence.

### A. Nature and Circumstances of the Offense

Tom takes full responsibility for his conduct in this case, and he is sincerely remorseful for the harm that he caused to the victims. Nothing in this pleading is meant as an excuse for Tom's behavior, nor is it intended to diminish the harm done to the minors by his conduct. He is utterly ashamed of his conduct, and while

he fully acknowledges the things that he did and the harm that he caused, he has trouble recognizing that version of himself. Although it is difficult for Tom to think about the things that he did, to talk about those things, and to have his loved ones hear the details, Tom has come to understand that he can only atone for his conduct after open acknowledgement.

In the nearly three years since he was charged in this case, Tom has made every effort to change his mind-set and to address his conduct so that it will never be repeated. Although there have been some fits and starts, Tom's acknowledgment of what he had done began when he was questioned by the Naperville Police Department on December 21, 2018, and admitted to all of the conduct with which he was confronted. Subsequent to his arrest on the instant charges, he engaged in a proffer session with the government and fully admitted to his conduct. He provided passwords that he could remember and authorized the agents to take over his social media accounts to conduct further investigation.

This case arose out of charges that originated in the Circuit Court of Will County. Tom was arrested on December 21, 2018, by the Naperville Police Department, and released on bond the following day. At the time of his release, Tom was still deeply within the throes of his drug addiction and, in fact, suffered a near fatal overdose in June 2019.

Tom was subsequently charged in the Circuit Court of Will County with one count of grooming. As part of the state court proceedings, Tom was evaluated by Dr. Karen Smith, a licensed sex offender evaluator, and found to be an average risk to

sexually reoffend. Dr. Smith also noted that Tom had many factors amenable to treatment, and his risk level did not dictate incarceration.[6]

Tom was subsequently arrested on the instant federal charges on September 19, 2019. Tom was still actively using drugs while on bond in Will County, and part of the federally charged conduct related to communications with minor girls while on bond in the Will County case. It is worth noting, however, that all of the conduct Tom engaged in while on bond occurred prior to his near fatal overdose in June 2019. He was eventually released on bond in this case on October 31, 2019. Since his release on federal bond, Tom has spent the past nearly three years working to address the mental and physical health issues that contributed to his offenses. The work Tom has done to ensure he commits no further crimes is extensive. For example, Tom has been addressing the issues that led to his conduct by engaging in weekly therapy with Dr. Smith – therapy sessions that first began following his release in Will County. Tom has also been taking all prescribed medications to treat underlying mental health issues. Significantly, Tom has also undergone intensive outpatient treatment at Compass Health Center in Westmont, Illinois for drug addiction. Unfortunately, and has been discussed during the pendency of these proceedings, Tom is a long-time drug addict, whose addiction was so severe, that it led to overdose on occasion. He has had some missteps related to his addiction

---

[6] The initial evaluation by Dr. Smith is Bookmark 1. Dr. Smith's follow-up reports describing Tom's progress are labeled Bookmark 2, 3, and 4.

during his lengthy pretrial release. Nevertheless, Tom has endeavored to address those problems through further treatment and self-evaluation.

Tom has also undergone a neuropsychological examination by Dr. Michael M. Gelbort, a clinical psychologist. Dr. Gelbort conducted a neuropsychological evaluation of Tom consisting of multiple lengthy interviews and extensive clinical testing. A copy of Dr. Gelbort's report can be found at Bookmark 14 of the under seal submission. Dr. Gelbort confirmed that Tom's conduct and motivation was not consistent with a pedophile or antisocial personality disorder. Rather, as a result of Tom's physical health, his mental and emotional development stopped in his early adolescent years. Specifically, Dr. Gelbort noted:

> Based upon my evaluation and experience, I do not see the patient's personality or motivation as being in line with pedophiles or antisocial personality disorder. Rather he suffered (continues to suffer with a now effectively treated) physical condition which caused his emotional development – especially with regard to boy-girl relationship development – to slow significantly or arrest in the mid-teenage years.
>
> …
>
> I see the patient as being in a very different situation psychologically now that his medical problem is being effectively treated. I also believe that he will need some time to psychologically develop and mature as simply having clear skin and the ability to be seen by others as normal will not cause himself to feel normal anytime soon. Providing ongoing psychotherapy, emotional support, support in a job, and drug screening/treatment should allow him to grow and catch up in the course of the next two to four years.

Bookmark 14, pp. 7-8.

Counsel submit that Tom has demonstrated an exceptional effort and level of commitment to addressing his conduct in this case. While he has had relapses in

his drug treatment, he remains committed to living a drug free life. He has availed himself of every opportunity for help and has sought out and obtained additional help when the circumstances of his situation threatened to overwhelm him.[7] Tom has also engaged in a significant amount of self-help and efforts to rehabilitate himself while on bond.[8]

Tom had never before been charged with any criminal offense. His relatively brief time in the MCC was an absolutely terrifying experience for him. Likewise, he has been under the strictest form of pretrial release – home incarceration.[9] As mentioned previously, while he has had missteps related to his drug addiction, he has not engaged in any further conduct similar to the offenses of conviction since being on federal release, and since working diligently on his mental health and sobriety. Tom is humiliated by his past conduct and is appalled by the harm his conduct caused to the victims in this case. He is dedicated to making amends and ensuring that nothing of this nature ever recurs.

---

[7] Bookmark 15 contains a September 23, 2019, letter from a drug abuse clinician at Hazelden detailing Tom's efforts toward rehabilitation while at their facility. Bookmark 16 is a February 1, 2021, letter from the Midwest Center for Hope and Healing detailing Tom's rehabilitation progress. Bookmark 17 is a February 8, 2021, letter from psychiatrist Dr. Michael Burda who has been treating Tom since 2017 and lauds him for his commitment to addressing his mental health and chemical dependence issues.

[8] As an example of some of Tom's self-help activities, Bookmark 18 is a weekly diary of Tom's activities while on bond compiled by Tom's first third-party custodian.

[9] While federal sentencing does not mandate credit for time spent on home incarceration, as Tom's aunt Joan Mullins, a former state court prosecutor in Will County, notes in her letter of support, under Illinois law, Tom would receive sentence credit for the time he spent on pretrial home incarceration pursuant to 730 ILCS 5/4.5-100(b).

## B. The Defendant's Background and Personal History

### 1. Tom's Physical Condition and Myriad Health Issues

To understand Tom's conduct, it is necessary to examine his physical and mental health. As the PSR reflects, Tom suffers from extremely serious cases of atopic dermatitis, asthma, and allergies. (PSR, ¶¶103-104) Tom has suffered from extreme depression and suicidal ideation as a result of his physical appearance his entire adolescence due to his disfiguring skin condition. It was not until he was prescribed Dupixent in late 2018 that he was finally able to begin progressing toward a relatively normal life. Eventually, the Dupixent injections not only cleared up his atopic dermatitis, but it eased his allergies and asthma. Unfortunately, without Dupixent, Tom's health rapidly deteriorates. During the month that Tom spent in the MCC, where he was not given access to Dupixent, his condition noticeably worsened. He suffered from constant itching, skin rashes, eye irritation, and breathing difficulties. Tom and his family are very concerned with how his health needs will be managed within the BOP during the custodial portion of his sentence.[10]

---

[10] Bookmark 5 of the under seal pleading is a description of Tom's medical history (including mental health issues) prior to his arrest created by Tom's mother Marianne Vivirito. Photos of Tom's condition are also included in this bookmark. Bookmark 6 contains medical records from Dr. Edward Keuer, Tom's primary dermatologist from 2006 through 2015. Bookmark 7 contains records from Dr. Diane Ozog, Tom's allergist since 2015. Also included are updated letters from Dr. Ozog from July 15, 2020, and May 11, 2021. Bookmark 8 contains Quest Diagnostic records reflecting Tom's immunoglobulin levels in 2015. Bookmark 9 contains records related to a neuropsychological evaluation of Tom at Loyola University Medical Center in 2015. Bookmark 10 contains records from National Jewish Health, a research hospital in Colorado, where Tom had an extended stay in 2016. Bookmark 11 contains a care plan for Tom developed by Dr. Jonathan Silverberg at Northwestern Medicine in 2018. Bookmark 12 contains three letters (dated February 10,

Tom's debilitating and disfiguring physical conditions resulted in years of depression and suicidal ideation. The focus of Tom's childhood was on trying various treatments and medications to solve his medical issues. He and his parents traveled to various doctors and hospitals around the country in search of a treatment to alleviate his physical suffering. Unfortunately, what got missed during the search for a treatment for Tom's medical conditions was the deterioration of his mental health as a result of them. Tom eventually chose the wrong path and opted to self-medicate with illegal drugs when what he really needed was to seek mental and emotional support in order to accept his condition, to mature and learn to love himself in spite of it. As Dr. Gelbort noted, all of these issues stunted Tom's emotional maturation at the age of an adolescent.

In the past two and half years, however, Tom has been permitted to engage in, among other things, group drug addiction counseling with people his own age who are struggling with the same lack of self-worth. Between this and his medical conditions finally being adequately treated, he has made great progress in the process of maturing and catching up to his peers that Dr. Gelbort opined would take two to four years. While Tom rightfully fears how his health conditions will be managed during the custodial portion of his sentence, he looks forward to continuing his journey of improved mental and physical health.

---

2021, May 11, 2021, and February 1, 2022) from Dr. Coleen Keegan at Northwestern Medicine – a dermatologist who has treated Tom since he was an infant. Bookmark 13 contains letters of November 18, 2020, and February 7, 2022, from Dr. Susan Rohde, an internal medicine and pediatrics physician, who has treated Tom since 2015.

## 2.    Tom's Character

Tom's character, in particular his relationship with his family and friends, is germane to the Court's sentencing analysis. Indeed, the number and nature of character letters which have been provided to counsel on behalf of Tom not only demonstrate and speak to his commitment to his personal growth and giving nature, but also to his role as relative and friend. His mother has provided a detailed insight into Tom's medical conditions and the care he has required throughout his life simply to stay alive in the face of so many medical challenges. Tom's mom writes in her letter of support:

> During his time on house arrest, Tom has stayed committed to the treatment of his depression, anxiety, and substance use. It was after his first arrest that he began seeing [Dr.] Karen Smith for psychosocial therapy; she has played a key role in helping Tom recognize where he was at and how to move forward. Her work teaching Tom how to navigate previous pain and trauma to grow into the young man he is today has been life changing.

In his letter of support, Tom's father describes his childhood as follows:

> It was during Tom's high school years that I noticed a change in him. He continued to make friends and was very involved in sports, playing rugby and golf – both teams competing in the state finals several times. Although Tom found community and support at school, he became very self-conscious about his eczema, which worsened with puberty. He became preoccupied with what his face looked like (how red it was, how bad the rashes were, how sunken and red were his eyes, etc.) and was always worried about how his peers would react to his appearance. This was the beginning of his depression and deepened anxiety. His doctors had warned us that there was a high risk of depression, self medicating with drugs, and even suicide attempts in adolescents with diseases since childhood. We hoped that Tom would be an exception, but that was not the case.

Tom's older brother Vince very astutely addresses some of the most pressing

concerns Tom faces going forward:

> And so, as many drug addicts do, he suffered relapses and ended up doing even more harm to himself and others in the time following his graduation from rehab. In these years during his post-rehab downward spiral he ended up committing these heinous crimes that he has [pled] guilty to, and here we are today. It took me a long time to wrap my mind around his crimes, but Tommy has helped me come to an understanding that he takes responsibility for his actions while he was in this dejected, lowest point in his life and vows to turn his life around, and his improvement and growth as a person has given me hope for his future.
>
> ---
>
> Ultimately, the decisions that Tommy makes in his future are entirely his own, but I want to emphasize that he will have a large family support system to guide him in being a productive and healthy member of our society…. We have expectations of him that I believe to be higher than what the legal system requires of him, and we have every intention of holding him accountable.

In addition to the letters submitted by Tom's closest family, other relatives, friends, and teachers have also expressed their support for him. All the letters consistently describe Tom as an individual devoted to his family, hard-working, and compassionate. Tom's aunt Joan Mullins, who acted as his third-party custodian when he was first released, writes:

> When Tommy first came to our house, on Halloween of 2019, I barely recognized him. Though still kind and polite, he had trouble putting a sentence together, was edgy, inarticulate and his thought processes were immature. He made the best of the opportunity given. Tommy attended (and looked forward to) his biweekly counseling sessions. He also sought, and received, specialized drug counseling. He read his assigned materials and began reading many other books, finding new interests.
> ---
>
> The changes I have seen in Tommy are remarkable. Tommy can now speak clearly, intelligently and I can see his thought process has matured. He looks healthy and he has control of his emotions. He has spoken with me about the offenses, what he has done and how the

victims would feel. He has definitely gained a deeper understanding of his actions and how they affected others.

Tom's mother's friend Kate Mackenbrock, who has known Tom since he was born, and who was diagnosed with ALS seventeen years ago, writes:

> Looking back, I am clearly able to see the suffering Tom endured from the moment he was born…. Our shared suffering has bonded us in an incredible way, and it has allowed us to speak openly and honestly with one another…. One topic we have discussed at length is the isolating effect of illness, and how it often creates a cycle of guilt and alienation that is incredibly difficult to break.

Many of the letters also describe Tom's involvement in volunteer activities, both before his commission of these crimes and since he has been on home incarceration. He has volunteered for many years with his grandmother's charity that provides for underprivileged families at the holidays. His tasks with the charity while on pretrial release have included wrapping presents and doing paperwork. He has also undertaken writing letters to adult cancer patients in a pen pal role to ease some of the isolation and suffering.

These excerpts, as well as other numerous letters submitted on Tom's behalf, demonstrate that he has strong emotional support in place to assist him upon his release from imprisonment. Tom is better equipped now to handle the struggles he will face because he has spent these past nearly three years committed to his therapy and getting the support he needed to deal with his mental health issues and drug addiction.

### C. Sex Offender Registration is, Itself, a Significant Punishment and Deterrent

The collateral consequences of Tom's conviction are atypically severe. Under the federal sex offender registration statutes, Tom will be required to register for at least fifteen years. *See*, 34 U.S.C. § 20911 (This section requires registration for individuals convicted of a "sex offense," which is defined, in part, as a criminal offense that is specified against a minor. The term "specified offense against a minor" includes offenses involving possession of child pornography.)[11] Under Illinois law, however, individuals convicted after 1999 of an offense substantially equivalent to child pornography (child pornography includes possession of child pornography) are considered to be "sexual predators." 720 ILCS 150/2(E)(1). Sexual predators must register for life. 730 ILCS 150/7.

Moreover, under Illinois law, sex offender registrants cannot live within 500 feet of a school, playground, or day care center unless they purchased the property before July 7, 2000. Tom currently resides with his parents. Should he live on his own after his sentence is complete, his residence will have to comply with this condition. In addition, once Tom is settled after his period of incarceration, he could be forced to move. Because this restriction applies to any future housing, if a school, playground, or daycare opens within 500 feet of Tom's new home, he will have to move.

---

[11] It appears from counsel's review of the statute that Tom's offense would categorize him as a Tier I sex offender which requires registration for 15 years. It is, however, possible that he could be categorized as a Tier II sex offender, which requires registration for 25 years. Tier III offenders must register for life.

Recent research on the topic has illuminated just how difficult it is for sex offender registrants to find appropriate housing. While restrictions vary by state, and available housing, of course, varies by community, a 2006 study focusing on Orange County, Florida (which includes Orlando), "found that combined multiple restrictions (schools, parks, daycare centers, and bus stops) reduced the number of dwellings available for sex offenders from 137,944 (total number of residential properties in the county) to 4,233 (3%) within 1,000-feet buffer zones and 37 (.03%) within 2,500-feet buffer zones." Jill S. Levenson & Andrea L. Herm, *Research Note: Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 JUST. RES. & POL'Y 59, 63 (2007), *citing* P. A. Zandbergen & T. C. Hart, *Reducing Housing Options For Convicted Sex Offenders: Investigating The Impact of Residency Restriction Laws Using GIS*, 8 JUST. RES. & POL'Y 1-24 (2006). *See also,* Max Green, *For Illinois Sex Offenders, Six Years Can Turn into Life in Prison*, WBEZ News (November 13, 2017) available: https://www.wbez.org/shows/wbez-news/for-illinois-sex-offenders-six-years-can-turn-into-life-in-prison/7ee28d46-959a-4661-8870-20b07d850d9c (discussing the difficulty of obtaining housing that complies with Illinois' sex offender restrictions).

Sex offender registration also provides this Court with extended protection to ensure that Tom never commits another offense. Even after he completes the custodial portion of his sentence *and* his term of supervised release, he will continue to be monitored, with his movements and locations restricted for the rest of his life.

**D. The Need for the Sentence Imposed to Satisfy the Purposes of Sentencing.**

18 U.S.C. §3553(a)(2) requires a court to consider the need for the sentence imposed to satisfy the purposes of sentencing, including whether it affords adequate deterrence to criminal conduct, protects the public from further crimes by the defendant, avoids unwarranted sentencing disparities and whether it provides the defendant with needed educational or vocational training. Given the circumstances of Tom's case, the defense submits that a sentence below the advisory guidelines is more than sufficient to meet these goals.

While this offense is no doubt serious, Tom does not require a lengthy sentence of imprisonment in order to be properly punished for his actions. He has never before been incarcerated, and any period of incarceration will necessarily have a more profound impact on him as a result. Furthermore, the absence of any criminal history, the fact that Tom is in Criminal History Category I, places him among those defendants least likely to commit further crimes. *See* United States Sentencing Commission, "A Comparison of the Federal Sentencing Guidelines Criminal History Category and U.S. Parole Commission Salient Factor Score," pp. 14-15 (January 4, 2005)(suggesting that Criminal History Category I does not adequately take into account the lack of recidivism risk for first time offenders.), available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf.

Given this Court's discretion, the unique matters discussed herein, and Tom's extensive efforts at rehabilitation, the defense requests the imposition of a reasonable sentence. Simply put, a term of imprisonment, even significantly below the advisory sentencing guidelines, will have a profound impact on Tom and will fulfill the purposes of sentencing.

## IV.    Restitution

As part of the plea agreement, Tom has agreed to make restitution to both the mandatory victims as well as the victims of the relevant conduct. The government has provided a partial restitution request, and counsel will address restitution when a complete request has been submitted.

## V.    Conclusion

Taking into consideration all the information and circumstances discussed herein, counsel respectfully requests that this Court impose a below-guidelines sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Respectfully Submitted,

/s/ Patrick W. Blegen
**PATRICK W. BLEGEN**, One of the Attorneys for Thomas Vivirito.

**BLEGEN & GARVEY**
53 W. Jackson Boulevard, Suite 1424
Chicago, Illinois 60604
(312) 957-0100
pblegen@blegengarvery.com